In re ICS CYBERNETICS,
INC., Debtor.

NATIONAL WESTMINSTER BANCORP
N.J., Successor-in-Interest to First Jersey National Corporation, Plaintiff,

v.

ICS CYBERNETICS, INC, the Official Committee of Unsecured Creditors of ICS Cybernetics, Inc., Rochester Community Savings Bank, Lefac International S.A., and Integrated Computer Systems Aktieboleg, Defendants.

Bankruptcy No. 88–00478.
Adv. No. 88–0114.

United States Bankruptcy Court,
N.D. New York.

Oct. 6, 1989.

Menter, Rudin & Trivelpiece, P.C., Syracuse, N.Y. (Jeffrey A. Dove, of counsel), Winston & Strawn, Cole & Deitz, New York City (Angela G. Tese, of counsel), for Nat. Westminster Bancorp., N.J.

Grass, Balanoff, Costa & Whitelaw, P.C., Syracuse, N.Y. (Mary Lannon Fangio, of counsel), for debtor.

Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, N.Y. (Garry Graber, of

counsel), for Official Committee of Unsecured Creditors.

Harris, Beach & Wilcox, Rochester, N.Y. (Jeffrey W. Baker, of counsel), for Rochester Community Sav. Bank.

Hill, Betts & Nash, New York City (Peter J. McHugh, of counsel), for Lefac Intern. S.A.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Bankruptcy Judge.

These matters come before the Court in three motions within and concerning the adversary proceeding commenced by National Westminster Bancorp N.J. ("Natwest"), as successor-in-interest to First Jersey National Corporation ("First Jersey"), in the bankruptcy case of ICS Cybernetics, Inc. ("Debtor").

By way of the first motion ("escrow motion"), Plaintiff Natwest and Defendants Debtor and the Official Committee of Creditors Holding Unsecured Claims of ICS Cybernetics, Inc. ("Committee") seek an Order directing Natwest to pay into an escrow account all payments due under a Master Agreement of Lease ("Master Agreement") and Equipment Schedules 1 and 2 pending the Court's determination of an adversary proceeding involving the same leases, as well as a certain sublease between the Debtor and Natwest.[1] The escrow motion relies upon §§ 362(a), 541 and 542 of the Bankruptcy Code, 11 U.S. C.A. §§ 101–1330 (West 1979 & Supp.1989) ("Code").

Second, in opposition to the escrow motion and in relation to Equipment Schedule 2, Defendant Rochester Community Savings Bank ("RCSB") moves for summary judgment on its counterclaim and for an order directing the payment of monies currently in escrow and entry of a judgment in the amount of $1,743,300.00 discounted to the date of payment plus late charges, interest, reasonable attorney's fees, costs and disbursements of the action. RCSB relies upon the provisions of the Master Agreement, Equipment Schedule 2 and the related Notice and Consent document and Article 9 of the New York Uniform Commercial Code (McKinney 1964 & Supp.1989) ("NYUCC").

The Committee has made the third motion, also for summary judgment, on its counterclaim and three cross-claims against co-defendant RCSB seeking an order 1) avoiding RCSB's security interest in Equipment Schedule 2's computer equipment and lease, 2) for entry of a judgment against RCSB in the Debtor's favor in the sum of all monthly payments made by Natwest to RCSB since January 1, 1988 with interest at the legal rate, 3) directing that Natwest pay to the Debtor all future rental payments under Equipment Schedule No. 2, and 4) for costs and disbursements. The Committee's motion is based upon the language in an Assignment of Lease document, Code § 544, 547, 549 and 550 and Article 9 of the NYUCC.

The Court heard oral argument on the three motions at an adjourned hearing in Syracuse, New York on February 28, 1989. The matter was finally submitted for decision on March 20, 1989.

The following constitutes findings of facts and conclusions of law, governed by Bankruptcy Rules ("Bankr.R.") 7001(2), 7008, 7012, 7013, 7022, 7052, 7054, 7056 and 9014.

## FINDINGS OF FACTS

At the hearing on February 28, 1989, the parties agreed to all the facts material to the two summary judgment motions except for the practice in the computer leasing industry as to the taking of equipment schedules and master agreements for the

---

1. The adversary complaint supplanted a motion made by Natwest on June 6, 1988 to compel payment of administrative expenses, assumption or rejection of the Master Agreement and an allegedly related sublease between the Debtor and Natwest and automatic stay relief ("June 6, 1988 motion"). The Court discontinued this June 6, 1988 motion on October 25, 1988 upon Natwest's representation that it would shortly commence an interpleader adversary proceeding which would raise the same issues.

purposes of perfecting security interests in the equipment's lease stream. This issue was to be fleshed out at an evidentiary hearing should the Court find it to be crucial.

Upon careful review of the record with respect to all three motions, as developed at the hearing and in the pleadings and submitted affidavits, the Court finds the following facts:

1. The Debtor, as Lessor, and First Jersey, as Lessee, executed a Master Agreement of Lease ("Master Agreement"), dated May 5, 1987, thereby agreeing upon the various terms regarding the rights and obligations of the parties with respect to separate leases of "tangible personal property" which were to be created by execution of certain Equipment Schedules.

2. The Debtor and First Jersey entered into Equipment Schedule # 1, dated May 5, 1987, identifying five pieces of computer hardware equipment manufactured by "IBM" to be leased for a forty-eight month term at monthly rental payments of $33,-900.00.

3. The Debtor and First Jersey entered into Equipment Schedule # 2, dated May 5, 1987, identifying six pieces of computer hardware equipment manufactured by "IBM" to be leased for a forty-eight month term at monthly rental payments of $44,-700.00.

4. Through an explicit "incorporation by reference" provision, all the terms and conditions of the Master Agreement were made a part of Equipment Schedules 1 and 2.

5. The Master Agreement and Equipment Schedules 1 and 2 provided that they were to be governed by New York State law.

6. The word "Original" was stamped on the top of the first page of Equipment Schedule 1 and 2, copies of which were each submitted as exhibits in opposition to the escrow motion, and was followed by a provision which read: "Counterpart *1* of 4 counterparts. Only counterpart # 1 shall be deemed to be the Original. No security interest may be created in this Lease except by the transfer and possession of the Original."

7. By letter dated July 6, 1987, the Debtor informed First Jersey that it had assigned all its rights in Equipment Schedule # 1 to Lefac International S.A. ("Lefac"), identified as Lender, in consideration of Lefac's extension of financing and instructed Natwest to remit all sums due and payable under said schedule, running from July 1, 1987 through June 30, 1991, to Lefac. Attached to the Notice Of Assignment was First Jersey's acknowledgment by signature of same, as directed by the Debtor, wherein, *inter alia*, it agreed to be bound by the assignment and make all payments to Lefac.

8. On or about December 9, 1987, the Debtor executed and delivered to RCSB a secured installment note in the sum of $1,692,775.18, a security agreement purporting to convey to RCSB a security interest in Equipment Schedule 2 and its subject equipment and an Assignment of Lease for same Equipment Schedule 2.

9. Sometime between December 9 and December 17, 1987, RCSB took possession of the Original (Counterpart 1) of Equipment Schedule 2.

10. RCSB never took possession of an original of the Master Agreement.

11. RCSB filed a UCC–1 financing statement on January 6, 1988 with the Office of the Secretary of the State of New York.

12. RCSB filed a UCC–1 financing statement on January 11, 1988 with the Office of the Onondaga County Clerk.

13. RCSB filed a UCC–1 financing statement on January 14, 1988 with the Office of the Secretary of the State of New Jersey.

14. The Debtor filed a Chapter 11 petition for relief on March 31, 1988.

15. On June 6, 1988, Natwest filed the June 6, 1988 motion.

16. Natwest unilaterally placed the July and August 1988 payments under Equipment Schedules 1 and 2 in an escrow account under its co-counsel's control and

**470**

continues to do so monthly in sums of approximately $83,000.00.

17. By letter dated August 18, 1988, RCSB, as the Debtor's assignee, notified Natwest that it was in default under the terms of Equipment Schedule 2 and the Master Agreement for failure to remit the rental payments due on July and August 1988 and that it considered Natwest's escrow of those payments to be a breach of the Notice and Consent.

18. By letter dated August 25, 1988, Lefac, as the Debtor's assignee, notified Natwest that it was in default of its obligations with respect to Equipment Schedule 1 by virtue of not having paid the rental payments for July and August 1988.

19. On September 16, 1988, Natwest, the Debtor and the Committee filed a notice of motion for an Order directing escrow of all payments due under the Lease (escrow motion), pursuant to Code §§ 362(a), 541 and 542, pending the outcome of its June 6, 1988 motion and returnable on September 25, 1988.

20. At the October 25, 1988 motion term in Syracuse, New York, the June 6, 1988 motion was discontinued and the Court reserved decision on the escrow motion.

21. At the November 1, 1988 motion term in Syracuse, New York, counsel for the Debtor, Natwest, RCSB and the Committee agreed to "hold" the escrow motion until Natwest's commencement of the interpleader since both proceedings raised the same issues.

22. On November 18, 1988, Natwest filed the underlying adversary proceeding seeking, *inter alia,* interpleader relief, and naming the Debtor, the Committee, RCSB, Lefac and Integrated Computer Systems Aktieboleg ("Integrated") as defendants.

23. The escrow motion was re-noticed by the Bankruptcy Clerk on December 21, 1988 and then on January 24, 1989.

24. Answers were filed by Debtor, RCSB, and the Committee on December 29, 1988, January 3, and 5, 1989, respectively, in which each asserted counterclaims and cross-claims.

25. RCSB filed notice of its motion for summary judgment on January 9, 1989.

26. The Committee filed notice of its motion for summary judgment on January 31, 1989.

27. Natwest has never filed a response to the counterclaims.

## ISSUES

The escrow motion and the two summary judgment motions present the following issues:

1) Whether there exist any material issues of fact in dispute so as to prevent summary judgment in favor of RCSB or the Committee and, if not, which is entitled to judgment as a matter of law?

2) Whether the assignment of the lease and equipment under Equipment Schedule No. 2 to RCSB was perfected before the statutory ninety day period and, therefore, valid and not property of the Debtor's estate within the meaning of 541?

3) In the event that the proceeds of Equipment Schedule No. 2 are not property of the estate, whether the "hell or high water" clause in the Master Agreement creating Natwest's "absolute and unconditional" duty to RCSB solely governs the rights of the parties regardless of Debtor's nonpayment of rent on a sublease with Natwest?

4) Whether circumstances exist sufficient to support an Order of the Court escrowing the past, present, and future proceeds of Equipment Schedule No. 1 owed to Lefac by Natwest, a portion of which is currently held in escrow by Natwest?

For the reasons stated hereinafter, the Court grants an Order in favor of Natwest, the Debtor and the Committee directing the continued escrowing of the lease payments under Equipment Schedule 1, grants in full RCSB's motion for summary judgment as to Equipment Schedule No. 2 and denies in full the Committee's motion for summary judgment.

## JURISDICTION

At the outset, the Court must determine if it has jurisdiction over the subject matter and, if so, whether the instant matters are core or non-core and the corresponding finality of its determination. 28 U.S.C.A. §§ 157, 1334 (West Supp.1989); Bankr.R. 9033.

With regard to subject matter jurisdiction, the Court notes that none of the parties have complied with Bankruptcy Rule 7008 which requires that "[i]n an adversary proceeding before a bankruptcy judge, the complaint, counterclaim, cross-claim, or third-party complaint shall contain a statement that the proceeding is core or non-core and, if non-core, that the pleader does or does not consent to entry of final orders or judgment by the bankruptcy judge."

Paragraph eight of Natwest's complaint reads "[t]his Court has jurisdiction over this proceeding pursuant to 28 U.S.C. Section 157 and Rule 7022 of Bankruptcy Procedure." But this statement is not responsive to the core—non-core question. While the Debtor, RCSB and the Committee have unqualifiedly admitted this allegation in their answers, Lefac denies knowledge or information sufficient to form a belief as to its truth in its answer. The balance of the pleadings relating to Equipment Schedule 2, e.g. RCSB's counterclaim and the Debtor's and the Committee's cross-claims, are silent on the issue of jurisdiction.

When the Court raised the issue at oral argument on February 28, 1989, RCSB stated that its counterclaim was core and the Committee responded with a concern that the Court was being asked to decide the relationship between two non-debtor parties. In a subsequently filed memorandum of law, RCSB argued that the primary action—the complaint—was a core proceeding, and that the Court had ancillary jurisdiction over its counterclaim, which was compulsory under Fed.R.Civ.P. 13(a) and Bankr.R. 7013. Rochester Community Savings Bank's Memorandum Regarding Matters Raised At Oral Argument, pp. 2–4 (Mar. 17, 1989). It also stated that "the court had jurisdiction to determine all of the issues currently before it" given the nature of Natwest's requests for relief in its complaint and the fact that "none of the parties are contesting the court's jurisdiction to resolve all of the issues involved in this case." *Id.* at 3, 4.

■ The instant motions are core proceedings, 28 U.S.C.A. § 157(b)(1), arising as they do in conjunction with a core adversary proceeding which has three parts, two of which bear the attributes of an interpleader brought on to determine the validity, priority and extent of the interest of four entities, including the Debtor, in certain income generating personal property. *See* 28 U.S.C.A. § 157(b)(2)(A, B, C, E, F, H, K, O).

This interpleader portion of the adversary proceeding arises under Title 11 within the meaning of 28 U.S.C.A. § 1334(b) because it invokes Code §§ 362, 541, 542, 544, 547, 548, 549, 550, and thus, is a core proceeding involving causes of action created and determined by Title 11's statutory provisions. *See Wood v. Wood (In re Wood)*, 825 F.2d 90, 96–97 (5th Cir.1987); *Kolinsky v. Russ (In re Kolinsky)*, 100 B.R. 695, 701 (Bankr.S.D.N.Y.1989).[2] *Cf.*

---

**2.** The Court notes that Natwest's "good faith fear of adverse claims" by virtue of its lessee status under Equipment Schedules 1 and 2 entitles it to utilize the interpleader device, pursuant to Bankr.R. 7022, as to that part of the underlying adversary proceeding since it is or may be exposed to double liability. *See* 3A J.W. Moore, J.D. Lucas, Groether, G.J. MOORE'S FEDERAL PRACTICE ¶ 22.02[1] at 22–7 (1989 ed.) (footnote omitted). However, the interpleader is not proper for the portion of the adversary that deals with the relationship of the Sublease to the Master Lease and which has been submitted for decision pursuant to the Debtor's motion for summary judgment on its

counterclaim which also seeks separate assumption and rejection. There is no stakeholder facing double or multiple liability or adverse claimants.

The so-called "two stage" process of entitlement and adjudication typically characterizing the interpleader is permissive and does not bar the court from totally disposing of the entire action at one time or, as here, disposing of it on the merits in several phases. *See id.* at ¶ 22.14[1], [2], *cited in New York Life Ins. Co. v. Ct. Dev. Auth.*, 700 F.2d 91, 95 (2d Cir.1983). *See also Avant Petroleum, Inc. v. Banque Paribas*, 853 F.2d 140, 143 (2d Cir.1988) (statutory interpleader).

*In re J.F. Naylor And Co., Inc.,* 67 B.R. 184, 191–92 (Bankr.M.D.La.1986) (interpleader seeking determination of questions involving property of the estate is one "arising in" a case under Title 11) (citing to *In re Cemetery Development Corp.,* 59 B.R. 115 (Bankr.M.D.La.1986)). *Compare National Co-op. Refinery Ass'n v. Rouse,* 60 B.R. 857, 859–60 (D.Colo.1986) (automatic stay triggered by one claimant's bankruptcy filing does not divest court of jurisdiction to adjudicate interpleader whose purpose was to determine title to proceeds claimed by that debtor since not yet property of the estate within the meaning of Code § 362(a)). It follows that all contested matters and applications within the adversary proceeding, as well as compulsory counterclaims and cross-claims pursuant to Bankr.R. 7013's incorporation of Federal Rule of Civil Procedure 13(a) and (g), are core under the doctrine of ancillary jurisdiction in that they are logically dependent on the original complaint. *See Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 375–76 & n. 18, 98 S.Ct. 2396, 2403 & n. 18, 57 L.Ed.2d 274 (1978). *See also* 28 U.S.C.A. § 1334(d); Code § 541. Fairness, "[t]he interest of judicial economy and principles of res judicata and collateral estoppel mandate that the bankruptcy and district courts have ancillary . . . jurisdiction under 28 U.S.C. § 1334." *Aerni v. Columbia Federal Savings (In re Aerni),* 86 B.R. 203, 207 (Bankr.D.Neb.1988).

Moreover, these three motions are core proceedings because their resolution might "have the effect of bringing property into the estate of the debtor." *St. Paul and Marine Insurance Co. v. PepsiCo, Inc.,* 884 F.2d 688, 701 (2d Cir.1989). This is so notwithstanding the dispute currently engendered between three non-debtor parties, plaintiff Natwest and defendants RCSB and Lefac.

Natwest's request in the complaint for discharge from all liability is presumably directed at the interpleader portion and will most likely be resolved in a second step subsequent to this Memorandum–Decision, assuming Lefac's submitted motion for summary judgment on the transactions involving the Master Lease and Equipment Schedule 1 addresses Lefac's cross-

With regard to the three motions at bar, the affidavit of mailing on the "escrow" motion, first returnable on September 27, 1988, indicates service by regular first class mail on September 16, 1988 to individual lawyers of RCSB and Lefac at each's law firm in New York state. The motion was repeatedly adjourned with assurances of stipulation and settlement until finally reserved on after argument on October 25, 1988. Thereafter, however, on November 1, 1988, the motion—as it related to RCSB—was to be held and not decided. Shortly thereafter, Natwest's local counsel informed the Court that Lefac had consented to the Court's "withholding consideration" of the "escrow" motion until the interpleader complaint was commenced. *See* Letter to Honorable Stephen D. Gerling from Jeffrey A. Dove, Esq. (Nov. 3, 1988). Subsequently, the Clerk of the Bankruptcy Court circulated two Notices of Hearings on the escrow motion to counsel for Natwest, the Debtor, the Committee, Lefac and RCSB: the first, dated December 21, 1988, set a hearing down for January 17, 1989 and the second notice, dated January 24, 1989, scheduled a February 28, 1989 hearing.

Local counsel for Natwest stated at the hearing on February 28, 1989 that Natwest had re-noticed the "escrow" motion again to all the parties. *See* Letter to counsel for Integrated, RCSB, ICS–AB, the Debtor, Lefac, the Committee, Union Bank of Norway from Jeffrey A. Dove, Esq. (Jan. 19, 1989) (advising that "escrow" motion placed back on Court's calendar). In addition to attacking the motion on the merits at the hearing on February 28, 1989, counsel for Lefac also raised procedural objections. He noted that the motion was made prior to the adversary proceeding, mooted by its commencement and then never formally made within it—which would have given Lefac the opportunity to respond governed by

claims against Integrated. *See* Bankr.R. 7054; Fed.R.Civ.P. 54(b); *see generally* 3A MOORE'S FEDERAL PRACTICE, *supra,* ¶¶ 22.14 [2, 5], 22.15.

Thus, the resolution of these remaining two motions will dispose of the entire adversary proceeding.

"the ordinary rules." In response to the Court characterizing the re-making of the motion as holding form over substance, counsel stated that the escrow motion should be held in abeyance until Lefac moved for summary judgment since the merits were intimately entwined with the escrow request.[3]

The Court cannot find that the submission of this motion at the close of the February 28, 1989 hearing, albeit these procedural irregularities, put Lefac to such a disadvantage so as to impair its ability to be given reasonable notice and an opportunity to be heard under Bankr.R. 9014 or 7004. As stated previously, the Court treated the escrow motion as formally submitted at the close of the hearing on February 28, 1989, subject to a period of time in which the attorneys were permitted to file memoranda.

RCSB's attached affidavit sworn to on January 6, 1989 indicates that it served its motion for summary judgment by mailing copies to counsel for the Debtor, the Committee, Natwest local and general, and Lefac.

Furthermore, each of the three nondebtor parties' general appearances, through counsel, in the bankruptcy case, the escrow motion and the adversary proceeding, amounts to a consent of the Court's jurisdiction within the meaning of 28 U.S.C.A. § 157(c)(2).[4]

In sum, the Court concludes that it has the subject matter jurisdiction to render final findings of fact and conclusions of law on the instant three motions pursuant to 28 U.S.C.A. §§ 157 and 1334.

## DISCUSSION

The Court will first consider RCSB's motion, as its disposition has the potential to expedite a portion of the determination of the "escrow" motion.

**I RCSB's & Committee's Motions for Summary Judgment**

### a. *Summary Judgment*

RCSB maintains that the issues of perfection with respect to its interest in the lease and the equipment and Natwest's independent obligation to make lease payments, are ripe for summary judgment and provides two supporting affidavits. Solely addressing the perfection issue and supplying two declarations pursuant to 28 U.S.C.A. § 1746, the Committee asserts that the documents and the nature of the transaction are undisputed and render the remaining interpretation of documentary evidence appropriate for summary judgment. The Debtor joins with the Committee in that neither dispute the facts as to the sequence of events surrounding the transaction between the Debtor and RCSB regarding this lease.

Natwest takes issue with the absence of disputed material facts on its direct and independent liability to RCSB. It argues that no independent obligation exists if the transfer of the Debtor's interest in the Equipment Schedule 2 lease payments is avoided. Natwest states that the Court has no information to ascertain whether the assignment was intended as security or otherwise, and if for security, then on the issue of perfection.

■ Fed.R.Civ.P. 56(e) provides that an adverse party cannot successfully challenge a properly made motion for summary judgment by "mere allegations or denials" and "must set forth specific facts showing that there is a genuine issue for trial." Natwest's affidavit in opposition does nothing more than set forth general allegations and fails to raise a genuine issue of material fact on the issue of its purported direct and independent liability to RCSB, which it considers as part of the perfection issue as to the lease payments.

---

3. Lefac's motion for summary judgment was formally submitted to the Court as of August 30, 1989.

4. The Court would also note that the filing of proofs of claim by Natwest and RCSB on July 26, 1988 and June 19, 1989 and on March 30, 1989, respectively, provides an additional ground for this Court's jurisdiction. *See Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 109 S.Ct. 2782, 2799 n. 14, 106 L.Ed.2d 26 (1989) (and citations therein).

On viewing the record in the light most favorable to Natwest, the Court cannot but agree with RCSB, the Debtor and the Committee that the standard under Fed.R. Civ.P. 56(c) has been met and that the pleadings, affidavits and declarations demonstrate no material questions of fact on the perfection question relating to the lease and the equipment under Equipment Schedule 2 so as to warrant a trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114–15 (2d Cir.1988); *S.J. Groves & Sons Co. v. Peters (In re Peters),* 90 B.R. 588, 601–03 (Bankr.N.D.N.Y.1988).

### b. *Perfection*

To determine which party is entitled to summary judgment as a matter of law, the Court now turns to the merits of the summary judgment motions relating to the perfection of the equipment and lease involved under Equipment Schedule 2.

Both RCSB and the Committee agree that the lease constitutes chattel paper within the meaning of NYUCC § 9–105(1)(b) and must satisfy the perfection requirements in NYUCC § 9–305. However, they part company on the elements necessary to perfect by possession the security interest in the chattel paper. RCSB contends that it was perfected on the day it made the non-recourse loan to the Debtor, December 9, 1987, by virtue of its being in possession of an original copy of the Equipment Schedule 2 and that its UCC–1 filings were only "precautionary." RCSB further states that its security interest in the equipment was perfected under the "bailee with notice" provision of NYUCC § 9–305 pursuant to Section 5.2 of the Master Agreement and the Notice and Consent. Moreover, at the February 25, 1989 hearing, it also noted that it held constructive possession of the Master Agreement under the bailment doctrine.

With regard to the perfection of the chattel paper, RCSB states that with or without possession of the Master Agreement, the possession of the Equipment Schedule satisfied the language and the purpose of § 9–305 since that document evidenced both a monetary obligation and a lease of specific goods. There is no need to possess the document incorporated by reference in a second document which, it claims, is significantly different from amending a document which contains a monetary obligation and a lease. RCSB also contends that this use of master agreements and schedules is "widespread" throughout the leasing industry and that a procedure such as that espoused by the Committee would be commercially unfeasible and unworkable.

RCSB further argues that Natwest's payment obligation is absolute based upon a "hell and high water" clause in provision 3.2 of the Master Agreement as incorporated in Equipment Schedule 2, a "waiver of defenses" in clause (ix) of the Notice and Consent and its third party beneficiary status of the contract between the Debtor and Natwest. Thus, it posits that this separate and independent duty to pay is untouched by the Debtor's bankruptcy and any possible transfer avoidances through untimely or inadequate perfection, the termination of Debtor's obligations under the assignment, the existence of a sublease, the assumption or rejection of the Sublease and/or Master Agreement and Equipment Schedule 2, the escrow account or Natwest's multiple liability. RCSB conjectured that should the perfection of its security interest fail, Natwest would then be obligated to pay both itself and the Debtor.

RCSB seeks a judgment ordering Natwest to release to RCSB all escrowed monthly lease payments together with interest, late charges and attorneys' fees. In addition, RCSB seeks to accelerate all remaining future payments under the forty-eight month lease with Natwest. The total amount of the escrowed and future proceeds is approximately $1,743,300.00.

The Committee takes the position that possession of an original of the Equipment Schedule 2, without possession of an original of the Master Agreement, is insuffi-

cient to allow RCSB to be perfected since "each equipment schedule constitutes a modification of the Master Lease." As such, together they constitute the entire and inseparable agreement and must be possessed in tandem to comport with the notice rationale imbued in Article 9.

With regard to the RCSB's security interest in the equipment, the Committee asserts that RCSB's New Jersey filing was made within the preference period, on January 14, 1988, so that its interest should be avoided, regardless of the result in the lease. However, at the hearing on February 28, 1989, it conceded that RCSB was probably correct as to it holding a perfected security interest in the equipment under the bailment doctrine but not in the more valuable lease.

In sum, the Committee maintains that because RCSB's assignment was made to provide security for the loan to the Debtor, the avoidance of that security interest due to lack of perfection removes their secured status and makes RCSB an unsecured creditor. All post-petition payments made to RCSB from Natwest thus become unauthorized under Code § 549 and entitle the Debtor to them, as well as all lease payments made in the ninety-day preference period.

At the February 28, 1989 hearing, Natwest argued that with respect to the assignment, to the extent the security agreement is undone and determined to be preferential, there is no proper perfection, the documents under which RCSB claim lease stream payments are voided, and its payment obligation would run to the Debtor, not RCSB, its assignee. It stated that absent the bankruptcy, RCSB is clearly entitled to the lease payments.

RCSB's response was that the avoidance of the perfected security interest did not avoid the assignment since the underlying documents establishing the contractual relationship between Natwest and RCSB had not changed. It also asserted that there could be no preference action under Code § 547 since the non-recourse loan it made to the Debtor pre-petition removed the antecedent debt of the "owed to the Debtor" factor required in Code § 547(b)(2).

Without reaching the disputed nature of practice within the computer leasing industry, the Court concludes that RCSB is entitled to summary judgment as a matter of law. NYUCC § 9–105(1)(b) (McKinney Supp.1989) defines "chattel paper" as a writing or writings which evidence both a monetary obligation and a lease. It does not include in that definition all writing or writings that merely bear on that monetary obligation and lease unless an "instrument" is an element of the transaction. *Id.* A lease is not an instrument. *See id.* § 9–105(1)(i); *See also* NYUCC § 9–105 Official Comment No. 3 (McKinney 1964) (writing which is a lease with respect to certain goods is not an "instrument"). Therefore, it is not necessary, as a matter of law, that the chattel paper be comprised of the "group of writings taken together" in this instance, but only that which evidences the lease and monetary obligation. *Id.* § 9–105(1)(b).

Execution of the Master Agreement, by itself, does not create a "monetary obligation". The amount and number of monthly rental payments are the essential elements of the lessee's monetary obligation, but nowhere in the Master Agreement is the rental amount or payment schedule set forth. Instead, it provides in section 3.1 for payment of "the monthly rent set forth in such Equipment Schedule ... [for] the number of payment periods set forth in the Equipment Schedule ..." This language states, in effect, that the performance promised by the lessee, i.e., the monetary obligation, is incurred solely by virtue of execution of the Equipment Schedule. Accordingly, this Court finds that the extent to which the terms of the Master Agreement governs the rights and obligations of the parties to the lease, *post facto*, does not affect the Equipment Schedule as the source of the monetary obligation.

The Master Agreement also is not a "lease for specific goods" as required for chattel paper. When referring to tangible personal property, the word "lease" means

a contract granting the right to possess property for a specified period of time in exchange for periodic payment of a stipulated rent. BLACK'S LAW DICTIONARY 800 (5th ed. 1979). Again, the Master Agreement does not specify the equipment subject to the lease, commencement date of the lease, lease period, or rental amount. The aforementioned terms are set forth only in the Equipment Schedule. Section 2 of the Master Agreement provides that "the term of this Master Lease shall ... continue in effect ... so long as any Equipment Schedule entered into ... remains in effect." The Master Agreement clearly bears upon the Equipment Schedule, but by its own terms depends entirely on the Equipment Schedule to supply the elements essential to the creation of the lease.

The intent of the parties, as evidenced by the language in the documents, indicates that the Equipment Schedule alone would constitute chattel paper. The Master Agreement states that "each Equipment Schedule contains the entire agreement between Lessor and Lessee ... [and that] [e]ach such Equipment Schedule (together with the terms and conditions of this Master Lease to the extent incorporated therein) shall constitute a separate lease" at sections 15.1 and 1, respectively. In addition, the Master Agreement has two "counterparts", each of which are deemed to be an "Original" whereas, the Equipment Schedule has only one "Original." The terms of both the Equipment Schedule (see page 1) and the Notice and Consent (see section (v)) provide that no security interest may be perfected in the lease except by possession of the Original, i.e., Counterpart No. 1 of the Equipment Schedule. To allow perfection of a security interest through possession of a duplicate or other "counterpart" of the Master Agreement is contrary both to the parties' intent and the policy underlying § 9–305 to the extent that more than one party could claim perfection via possession at any given time. The facts cited above also fail to support the position urged by the Committee that the Master Agreement is "modified" by Equipment Schedule No. 2.

The Master Agreement fails as chattel paper because it does not constitute, in whole or in part, the "monetary obligation" or "lease of specific goods." The Master Lease merely provides terms and conditions that are devoid of legal effect unless an Equipment Schedule exists which evidences the exchange of the lessee's monetary obligation for the lessor's lease of specific equipment.

Accordingly, the Court finds that RCSB's possession of Equipment Schedule No. 2, i.e., chattel paper, on or about December 9, 1987, was sufficient to perfect its security interest in the lease proceeds under NYUCC § 9–305. The policies with regard to notice underlying § 9–305 do not countenance otherwise. *See Allegaert v. Chemical Bank*, 657 F.2d 495, 506 (2d Cir. 1980). *See generally* 2 White, Summers, Uniform Commercial Code 24–12 (3d ed. 1988).

■ Likewise, with respect to RCSB's security interest in the computer equipment that is the subject of Equipment Schedule No. 2, the Court finds it to be perfected by possession as well. NYUCC § 9–305 (McKinney Supp.1989) provides for perfection of security interest in goods or chattel paper where the collateral is in the possession of a bailee with notice of the secured party's interest. *See id.* The Notice and Consent was executed by RCSB, First Jersey National Corporation and Debtor on October 30, 1987. RCSB's security interest in the equipment was perfected outside the statutory ninety-day period since the equipment was installed at First Jersey's New Jersey location prior to the execution of the loan in early December 1987, thereby resulting in Natwest being the bailee with notice of the assignment. *See Ingersoll–Rand Financial Corp. v. Nunley*, 671 F.2d 842, 844–45 (4th Cir. 1982); *Hasset v. Blue Cross and Blue Shield of Greater New York (In re O.P.M. Leasing Services, Inc.)*, 46 B.R. 661, 670 (Bankr.S.D.N.Y.1985). Thus, the assignment from Debtor to RCSB is valid and the proceeds escrowed by Natwest under Equipment Schedule No. 2 are not property of the Debtor's estate.

### c. The "Hell or High Water" Clause

■ RCSB contends that Natwest has an independent and unconditional duty to pay RCSB by virtue of the terms incorporated into the Equipment Schedule and that Natwest's failure to perform warrants a judgment of default and order granting RCSB its remedy under the lease to accelerate Natwest's payment obligations as a matter of law. The Court agrees with RCSB.

The so-called "hell or high water" clause is set forth at section 3.2 of the Master Lease. It provides in pertinent part that:

Lessee shall pay all rental payments and all other amounts payable under each Equipment Schedule to Lessor [or Lessor's Assignee] without offset, abatement, deduction, counterclaim, interruption or deferment ... Lessee agrees that ... the obligation to pay all rental payments and all other amounts payable thereunder, are absolute and unconditional [and that] this Section 3.2 shall apply notwithstanding (x) any breach by Lessor or Lessor's Assignee of any provision of the Equipment Schedule ...

The meaning of this provision is clear and unequivocal in that it requires the lessee to perform its obligation under the lease regardless of any defense or claim of Natwest's as to Debtor, RCSB or any sublease in effect.

According to the Notice and Consent executed by Debtor, RCSB and First Jersey, lessee First Jersey agreed, *inter alia,* that through assignment of the lease, all monthly lease payments pursuant to Equipment Schedule No. 2 would be paid directly to RCSB without reduction, counterclaim or defense and also that "the Lease is in full force and effect." A further provision in the Notice and Consent additionally made clear that the obligation running from Natwest to RCSB was independent of any other agreement in providing that no additional agreements between Natwest and Debtor relating to the equipment subject to the lease exist. Thus, Natwest was well aware of their unconditional and absolute obligation originally to Debtor and subsequently to RCSB.

It is well settled that *sui juris* parties are free to fashion their own remedies for breach of contract and that to deny full effect to such a remedy is impermissible in that it is contrary to the intent of the parties. So-called "hell or high water" clauses have been routinely accorded full force and effect by courts even in the face of defaults by the party seeking to enforce them. *See e.g. Philadelphia Savings Fund Society v. Deseret Management Corporation,* 632 F.Supp. 129, 136 (E.D.Pa. 1985); *State of West Virginia v. Hassett (In re O.P.M. Leasing Services, Inc.),* 21 B.R. 993, 1006 (Bankr.S.D.N.Y.1982).

This Court grants summary judgment in favor of RCSB because it has established its perfected security interest in the lease and equipment subject to Equipment Schedule No. 2 and Natwest has not submitted any facts that are relevant to Natwest's unequivocal obligation based upon the hell or high water provision incorporated into the Equipment Schedule. Natwest is, therefore, liable to RCSB for their default under the Lease and subject to the remedies therein.

### II Escrow Motion

Since the granting of RCSB's motion has obviated the need to consider escrowing the proceeds from Equipment Schedule 2, the Court will now turn to that part of the escrow motion directed at the past, present and future lease proceeds from Equipment Schedule 1.

Lefac contests this Court's ability to escrow the proceeds of a lease that is not property of the estate where there has been no showing of a probability of success on the merits on the underlying complaint. It states that it is the owner of the equipment and lease under Equipment Schedule 1 for which it provided more than adequate consideration and, as such, the Debtor has no cognizable interest to warrant granting the escrowing of the lease payments.

Natwest claims that it is "between a rock and a hard place" since while it is obligated to pay Lefac under the Master Lease and the Equipment Schedule 1, Code §§ 542, 541 and 362(a) impose contrary obligations.

Absent this Court's determination as to whether or not the lease and the related equipment are property of the estate or an Escrow Order preserving the monies pending such determination, Natwest states that it faces a potential double liability. It further asserted that it was not concerned with who held the monies, but that its paramount concern was to be told who is entitled to payment.

The historical equitable underpinnings of both the interpleader device, *see* 3A MOORE'S FEDERAL PRACTICE, *supra*, ¶ 22.16[1], and the bankruptcy courts strongly encourage the Court's issuance of an order to essentially enjoin the transfer of the lease payments from Natwest to Lefac under Equipment Schedule 1 and direct the former to deposit said proceeds in a "safe" account so as to preserve the monies until a resolution of that relevant part of the interpleader is reached.

Here, allegations of Lefac's financial insolvency have neither been denied by its counsel nor substantiated by any party. While the Court takes notice of the discussion at the hearing regarding Lefac's proposal to issue a letter of credit essentially backed by its parent corporation, allegedly a billion dollar foreign banking enterprise in good fiscal health, no formal arrangements have been made for such an instrument nor has even a preliminary agreement been reached.

The Court also acknowledges its factual findings in a prior proceeding that Lefac was in the process of liquidating some three months ago, is a wholly-owned subsidiary of Christiana Bank of Luxembourg, S.A. which has gradually assumed its operations and that said Christiana Bank is a wholly-owned subsidiary of Christiana Bank of Kreditcasse, which has a branch office in New York City and is authorized to do business in New York State. *See ICS Cybernetics, Inc. and The Official Committee of Creditors Holding Unsecured Claims of ICS Cybernetics, Inc. (In re ICS Cybernetics, Inc.)*, Case No. 88–00478, Adv. Pro. No. 89–0036, slip op. at 6 (Bankr.N.D.N.Y. July 13, 1989) (Debtor's motion for an order of attachment, or preliminary injunction, in underlying adversary proceeding).

In light of Lefac's inability to guarantee its own financial stability or provide an alternative of such assurance through some instrument, the issuance of an injunctive order "freezing" the lease proceeds until that portion of the interpleader is resolved appears to be warranted to preserve those proceeds and any actions regarding them pending adjudication of whether they are property of the Debtor's estate in compliance with Code §§ 362(a), 541 and 542. This Court has in the past, upon a proper showing, granted such actions where they are necessary to maintain the status quo. *See, e.g., Balanoff v. Glazier (In re Steffan)*, 97 B.R. 741 (Bankr.N. D.N.Y.1989).

Moreover, the fact that Lefac was characterized as a Lender in the Notice of Assignment and Lessee's Acknowledgement, in contrast to its stated role as buyer, coupled with its purported purchase from Integrated Computer Systems Aktieboleg predating by some thirteen days the conveyance from the Debtor—without any representation as to the relationship between Integrated and the Debtor justifying such treatment—leads the Court to find that there does exist a probability of success on the Debtor's and the Committee's cross-claims against Lefac. This reinforces the need to preserve the past, present and future lease proceeds so that they will be available for the Debtor if these lease proceeds are found to be property of the estate and not subject to any interest of Lefac—an outcome not assured given Lefac's uncertain financial picture.

### III Attorneys' Fees and Costs and Disbursements

Natwest, the Committee and RCSB all seek costs, disbursements and attorneys' fees incurred in appearing on the three motions at bar.

First, as the Court has previously indicated, the underlying adversary proceeding is not a "pure" interpleader, since it also seeks a declaration on the severability of the Master Lease and the Sublease vis-a-vis

the Debtor alone. While the result may impact upon the two-part interpleader portion of the complaint, it, in and of itself, does not present an interpleader situation absent the presence of a stakeholder and adverse claimants.

That is not to say that Natwest may not be entitled to fees for its role as a stakeholder in that portion of the adversary allocated to the interpleader. "It is within the discretion of the court to award the stakeholder costs, including reasonable attorney's fees, out of the deposited fund." MOORE'S ¶ 22.16[2] at 22–169. The Court is also cognizant of the equitable practice of awarding attorneys' fees to stakeholders in interpleader actions since those sums are generally nominal and to do so would encourage the bringing of such actions.

The Court will hold consideration of an award of fees and related costs and disbursements to Natwest until the balance of the interpleader part of the adversary complaint is concluded and upon the submittal of an application. The Court can then address whether Natwest is "disinterested" and whether it was forced to retain counsel, not because of its own wrongdoing but where it was "the mutual target in a dispute which is not of his own making." *Id.* at 22–173. These factors will bear on the appropriateness of any award and its size.

With regard to the Committee's and RCSB's request for costs and disbursements, which presumably includes attorneys' fee, the Court is bound by the American Rule. That rule provides that the prevailing party must bear its own costs absent statutory or contractual authorization or a showing of fraud or bad faith. *See Pucello v. Bisignani (In re Bisignani),* Ch. 7 Case No. 87–01555, Adv. No. 88–0004, slip op. at 4–5 (N.D.N.Y. October 6, 1988); *Members Credit Union (In re Kellar),* Ch. 7 Case No. 87–01682, Adv. No. 88–0022, slip op. at 6 (N.D.N.Y. June 8, 1989) (see cases cited therein).

Since the documents giving rise to RCSB's rights and obligations provide for the award of attorneys' fees, the Court finds it is contractually authorized and hence entitled to reasonable attorneys' fees

from Natwest, lessee, under the Master Agreement of Lease ¶ 11.2 and assignment of lease. The Court directs RCSB to submit an application for its review on reasonableness.

Lacking both a contractual or statutory basis and evincing nothing that could fall within the bad faith exceptions, the Committee's request for costs and disbursements is denied.

## CONCLUSIONS OF LAW

Accordingly, having disposed of RCSB's counterclaims, three of the Committee's five cross-claims and half of its counterclaim asserted on behalf of the Debtor, as well as one of the Debtor's two cross-claims, it is hereby

ORDERED:

1. That the "escrow" motion by Natwest, the Debtor and the Committee is denied as moot insofar as it concerns the Equipment Schedule 2 proceeds to RCSB and is granted insofar as it concerns the Equipment Schedule 1 proceeds to Lefac until the Court decides Lefac's motion for summary judgment;

2. That Natwest direct its co-counsel to close the current account which has been the depository of all monies from Equipment Schedules 1 and 2;

3. That Natwest shall direct its co-counsel, the firm of Menter, Rudin, Trivelpiece, to transfer all sums relating to Equipment Schedule 1 that are currently in the escrow account, into a new interest bearing account at a Syracuse, New York bank with a reference of ICS, 88–00478/88–0114 and deposit therein all future payments under Equipment Schedule 1 pending the Court's adjudication of Lefac's motion for summary judgment;

4. That, pursuant to Bankr.R. 7054 and Fed.R.Civ.P. 54(b), and there being no just reason for delay, Natwest is directed to remit to RCSB from the escrow account under the control of its local counsel all monthly lease payments it has been holding since June 1, 1988 pursuant to Equipment Schedule 2, plus the accrued interest with late charges of two percent each month,

and the present value of $1,072,800 (the remaining twenty-four lease payments at $44,700.00 per month under Equipment Schedule 2);

5. That Natwest's request for costs, expenses, disbursements and reasonable attorneys' fees shall be held in abeyance pending the conclusion of the entire adversary proceeding and the submittal of an appropriate application;

6. That RCSB's request for reasonable attorney's fees and costs and disbursements shall be approved and as the Debtor's assignee it is entitled to payment from Natwest under the Master Lease as incorporated in Equipment Schedule 2 upon the submittal of an application to the Court;

7. That the Committee's request for the costs and disbursements of the action is denied.