**LEASETEC CORPORATION, Plaintiff,**

**v.**

**ORIENT SYSTEMS, INC., Isabellam, Orlando a/k/a Belle Orlando, Leibstone Associates, Inc. a/k/a William Leibstone Associates, Inc., William Leibstone, Montenapoleone, Inc., Marcel Zakka, Defendants.**

No. 98–6781–CIV.

United States District Court, S.D. Florida, Fort Lauderdale Division.

Nov. 30, 1999.

Charles Howard Lichtman, Genovese Lichtman Joblove & Battista, Miami, for Leasetec Corporation.

Robert Charles Stone, Boca Raton, FL, for William Leibstone.

Jerry B. Katzen, Katzen & Katzen, Boca Raton, FL, for Robert J. Goral.

James Harrell Greason, Miami, FL, for Bobby L. Mack, North Dade Community Dev. Corp.

Robert Nelson Pelier, Coral Gables, FL, for Montenapoleone, Inc., Marcel Zakka.

Keith Andrew Goldbaum, Friedman, Rosenwasser & Goldbaum, Boca Raton, FL, for Mister Blister Packaging Co., Inc., Louis N. Demas, Patricia J. Demas.

## MEMORANDUM OPINION AND FINAL JUDGMENT

DIMITROULEAS, District Judge.

This cause came before the Court for non-jury trial on November 18 and 22, 1999. The Court having heard the evidence, judging the demeanor of the witnesses, hearing argument of counsel and otherwise being duly advised in the premises, does hereby make the following findings of fact and conclusions of law.

### STATEMENT OF THE CASE

In this action, Plaintiff, Leasetec Corporation ("Leasetec"), an equipment lease

finance company, is seeking to recover monies expended for leases it financed resulting from a fraudulent scheme entered into between Orient Systems, Inc. ("Orient") and defendants Leibstone Associates, Inc. ("Leibstone Associates") and Montenapoleone, Inc. ("Montenapoleone") and their principals, sometimes hereafter collectively referred to as the Lessee Defendants.[1]

Leasetec asserts that Orient and the Lessee Defendants fraudulently induced Leasetec to enter into lease agreements with each of them by: (i) making false misrepresentations regarding the actual highly inflated cost of the equipment being acquired by the Lessee Defendants through Orient and paid for by Leasetec, (ii) misrepresenting to Leasetec by their execution of a Delivery and Acceptance Certificate that they had received in good working order the computers allegedly being leased, when in fact, they had not, and (iii) as to Leibstone Associates, not disclosing to Leasetec that $60,000 in the funds Leasetec was providing (above the actual value of the equipment) were being kickbacked and split between Leibstone Associates and Orient.

After the leases and their related documents were signed, including personal guarantees of the corporate principals, Leasetec paid Orient for the equipment. The Lessee Defendants then defaulted under their respective leases. Thereafter, Leasetec made demand upon the Lessee Defendants who acknowledged their lease defaults, but claim they were excused from performing under the leases because they never received the computers or, as in the case of Leibstone, its under the table money from Orient. This lawsuit followed these revelations and proceeded to trial on claims of breach of lease agreement, breach of guaranty and fraud as to both sets of defendants. Leibstone Associates asserted affirmative defenses of unconscionability and lack of consideration. Montenapoleone pled no affirmative defenses but through argument at trial, asked the Court to allow it to adopt the defenses of Leibstone Associates.

## FINDINGS OF FACT

### (i) *As to Leibstone Associates and Leibstone.*

On or about March 23, 1998, Leasetec and Leibstone Associates entered into a lease with Leasetec ("Leibstone Lease"— Plaintiff's Exhibit 1) whereby Leasetec agreed to lease to Leibstone Associates certain computer equipment ("Leibstone Equipment"). Pursuant to the Leibstone Lease, Leibstone Associates was to pay Leasetec the combined monthly rental (under two different schedules [signed at separate times] of $2,622.36 for the lease term of 36 months). As part of this transaction, Leibstone Associates also represented to Leasetec, through the submission of detailed System Schedules, that the purchase price for the specifically identified Leibstone Equipment was $60,003.88 (Plaintiff's Exhibit 2) for the first part of the transaction and $18,134.99 (Plaintiff's Exhibit 3) for the other part of the transaction, which closed a day apart.

On March 31 and April 1, 1998, Leibstone Associates also signed Delivery and Acceptance Certificates (Plaintiff's Exhibits 4 and 5) for the computer equipment, which referenced the Lease and the foregoing System Schedules. Each "D & A", as the document is known in common leasing parlance, contains the following lessee representation:

"Lessee hereby acknowledges receipt and acceptance of the Equipment and Software listed on the above referenced SYSTEM SCHEDULE and agrees the Equipment and Software has been delivered and is ready for use under the terms of the above referenced MASTER

---

1. The leases subject to this litigation were procured through a Ft. Lauderdale based supplier of computer equipment, Orient, who could not be found by Plaintiff for service of process, and therefore, was previously dismissed from this cause without prejudice.

LEASE AGREEMENT." (Emphasis in original).

Also on March 20, 1998, defendant William Leibstone executed and delivered to Leasetec a personal guaranty (the "Leibstone Guaranty," Exhibit 8), whereby he unconditionally guaranteed the obligations of Leibstone Associates under its lease. The entirety of the Leibstone Associates transaction was orchestrated individually by Leibstone, the company's shareholder, officer and director.

Leibstone also testified at trial and admitted:

(a) He was recommended to Orient through a Dentist whose office was next door to his and who had a good experience with Orient. In effecting this transaction with Orient, Leibstone thought his company was going to receive some leased computer equipment and some capital, which it needed badly, and that the equipment lease and capital funding would be repaid in two to three years.

(b) The value of the computer system was less than the approximate $78,000 amount stated on the two System Schedules, since he expected to receive about $60,000 cash, and this information was not disclosed to Leasetec, with whom he had no contact whatsoever.

(c) The representations Leibstone signed to in the D & A's were not true when they were signed, because Leibstone Associates did not receive the computers (or for that matter, the promised money) from Orient then or at any time thereafter.

(d) That by signing the guarantee, if his company didn't pay its debt, Leasetec had a right to come against him and he admitted he was responsible for the consequences of his actions.

(e) He never paid Leasetec because he never received the computer or the funds from Orient.

(f) His company was in desperate need of financial assistance.

(g) He is an experienced sophisticated businessman, previously serving as CEO of a public company while working with national banks on large lending facilities.

(h) He did not investigate or shop for any other computer supplier besides Orient and did not attempt to seek alternate financing arrangements from any company other than Leasetec.

### (ii) *As to Montenapoleone and Zakka.*

On or about March 19, 1998, Leasetec and Montenapoleone, a high-end men's clothing store at the Aventura Mall, entered into a lease ("Montenapoleone Lease"—Plaintiff's Exhibit 19) whereby Leasetec agreed to lease to Montenapoleone certain computer equipment. Pursuant to the Montenapoleone Lease, Montenapoleone was to pay Leasetec the combined monthly rental of $1,925.80 for the lease term of 36 months. Montenapoleone also signed both a System Schedule certifying to purchasing $57,282.88 of equipment (Plaintiff's Exhibit 20) and a D & A Certificate (Plaintiff's Exhibit 21), both otherwise identical in verbiage to the Leibstone documents described above.

Also on March 19, 1998, defendant Marcel Zakka ("Zakka"), through his authorized agent and store manager, Giovanni Scuotto ("Scuotto"), executed and delivered to Leasetec the Zakka Guaranty (Plaintiff's Exhibit 23) whereby he unconditionally guaranteed the obligations of Montenapoleone under its lease. In fact, all of the Montenapoleone lease documents were signed by Scuotto, who both wrote and printed Zakka's name as President of Montenapoleone for the corporate signatures, and Zakka, individually for the guarantee. Both Zakka and Scuotto had significant involvement in procuring the transaction with Tim Mayer, a high level employee with Orient, because they wanted to acquire computer "point of sale" inventory control equipment for the clothing store Zakka admitted that Scuotto was his highly trusted store manager, and was vested with authority to handle virtually any or all of the business of Montenapoleone, and that he would want his custom-

**1314**

ers and vendors to rely on the authority of Scuotto, in his managerial capacity.

As to Zakka and Montenapoleone, based upon the testimony of Zakka and Scuotto, the Court further finds:

(i) Zakka authorized and negotiated at least part of the transaction, and expected and wanted it to close,

(ii) Zakka signed and delivered a credit application to Leasetec (Plaintiff's Exhibit 17),

(iii) Zakka directed Scuotto to write a check, Plaintiff's Exhibit 18, in the amount of $3851 to Leasetec for the first and last month's payment.

(iv) Zakka knew the computer cost was about $50,000 (it was $57,382, but the Montenapoleone Credit Application was for exactly $50,000) and that the monthly lease payments were about $1800 to $2000 a month (they were $1925.80).

(v) Zakka and Scuotto learned of Orient through Tim Mayer, one of its computer salesmen who was a customer of the store.

(vi) The representations signed to by Scuotto in the D & A were not true when signed, because Montenapoleone did not receive the computer from Orient, then, or at any time thereafter,

(vii) Montenapoleone never paid Leasetec because he never received the computer from Orient.

(viii) Zakka is an educated experienced sophisticated businessman, owning numerous business dealing in international exporting and previously dealing with national banks on lending facilities for his business interests.

(ix) Zakka did not investigate or shop for any other computer supplier besides Orient and did not attempt to seek alternate financing arrangements from any company other than Leasetec.

(x) Neither Zakka nor Scuotto ever gave any type of notice to Leasetec at any time that Scuotto's signing of the lease documents was with any limited authority.

(iii) *Findings as to All Parties.*

All parties repeatedly stressed the point that no Lessee Defendant ever had contact with any Leasetec employee or agent where any detail of the computer equipment, lease terms or financing was discussed. In every lease transaction, Orient had the sole contact with the Lessee Defendant and served as the middleman in the exchange of information, money and the lease documents.

In reliance upon the written representations of the Lessee Defendants concerning the equipment cost stated in the Lease Schedules, combined with their signatures on the Delivery and Acceptance Certificates acknowledging they received and accepted the equipment, Leasetec extended funds intended to purchase the equipment listed in each lease and subsequently paid the lease purchase funds to Orient, the computer sales vendor.

Without contest, each Lessee Defendant's lease contains the following language at the paragraph attributed to it:

2. TERM. "... Each Lease shall be a net lease and Lessee's obligation to pay all Rental Payments (which include rent for use of the Equipment, Software usage fees, and charges for Services) and any other sums thereunder, shall be absolute and unconditional, and shall not be subject to any abatement, reductions, set off, defense, counterclaims, interruption, deferment or recoupment, for any reason whatsoever. A late charge on any Rental Payments or other sums due hereunder shall accrue at the rate of 18% per annum..."

3. WARRANTIES. "Lessee acknowledges that it has made the selection of each item included in the System based upon its own judgment and expressly disclaims any reliance upon statements made by Lessor. LESSOR MAKES NO EXPRESS OR IMPLIED WARRANTIES INCLUDING THOSE OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE WITH RESPECT TO THE SYSTEM AND

HEREBY DISCLAIMS THE SAME. Lessor shall have no liability for any damages, whether direct, indirect, general, special, incidental, exemplary or consequential, incurred by Lessee as a result of any defect or malfunction of the System. Lessee shall look solely to the suppliers of the Equipment, Software and Services for any and all claims related to the System. Lessee understands and agrees that neither the suppliers nor any salesperson or other agent of any suppliers is an agent of Lessor. No salesperson or agent of a supplier is authorized to waive or alter this Lease, and no representation by a supplier shall in any way affect Lessee's duty to pay the Rental Payments and perform its obligations under the Lease...." (Emphasis in original).

11. EVENTS OF DEFAULT. "An Event of Default shall occur hereunder if Lessee (i) fails to pay any Rental Payment or other payment required hereunder when due and such failure continues for a period of ten (10) days after written notice from Lessor, or...(iv) **makes any representation or warranty herein or in any document furnished by Lessee in connection herewith, which shall have been materially false or inaccurate when made or at the time to which such representation or warranty relates**.... Any Event of Default shall be deemed material and a substantial impairment of Lessor's interests for the purpose of this Lease..." (emphasis supplied.)

Finally, the Court also finds that both Leibstone Associates and Montenapoleone defaulted under their leases by failing to make the monthly payments due thereunder. After the default by both corporations under their leases, demand was made upon Leibstone and Zakka, respectively as guarantors of the obligations of their companies, and they have refused and failed to make payment to Leasetec. Pursuant to paragraph 12 of each Lease. Leasetec accelerated the payments due thereunder and declared the entire present value bal-

ance due in amounts described below to be immediately due and payable.

## CONCLUSIONS OF LAW

Leasetec proceeded to trial against each Lessee Defendant for the same three claims, all pled identically, except for the obvious facts such as name, dates and amounts, including: (I) breach of lease, (II) breach of guaranty, and (III) fraud in the inducement.

### (i) *Breach of Lease and Breach of Guaranty.*

The parties do not contest that this matter is governed by Article 2A of the Florida Uniform Commercial Code. Fla. Stat. On 680 et. seq. governing equipment leases. Of primary consideration to the enforceability of the respective leases and the related documents in evidence are two central provisions, being first, the "hell or high water" clause found at paragraph 2 of the leases, and second, a disclaimer of warranties, found at paragraph 3. No defendant in their pleadings or by argument contested the enforceability of the disclaimer of warranty clauses, which the Court notes are expressly allowed to be included under these leases pursuant to Fla. Stat. § 680.214.

Further, under Florida common law, warranty disclaimers are enforceable. See *Belle Plaza Condominium Association, Inc. v. B.C.E. Development, Inc.*, 543 So.2d 239 (Fla. 3rd DCA 1989). (Defendant properly disclaimed by bold and conspicuous disclaimer any and all express or implied warranties.) See also *McCormick Machinery, Inc. v. Julian E. Johnson and Sons, Inc.*, 523 So.2d 651 (Fla. 1st DCA 1986). Disclaimer of warranty provisions such as that contained in the subject Leases are uniformly enforced by the courts. *Meeting Makers, Inc. v. American Airlines*, 513 So.2d 700 (Fla. 3rd DCA 1987). The facts are clear that Leasetec *did not* make representations or warranties with respect to the subject equipment, and expressly disclaimed them in the written doc-

uments attached to the Complaint, which must control in this instance.

Not only does the law support the enforcement of the warranty disclaimers, the admissions of the defendants make clear they should be enforced. For instance, the first sentence of each warranty disclaimer provides that the, "Lessee acknowledges that it has made the selection of each item included in the System based upon its own judgment and expressly disclaims any reliance upon statements made by Lessor." The parties' pre-trial statement, all of the evidence and defendants' closing argument makes clear their position that they agree they had no contact with Leasetec whatsoever in this transaction, and therefore, they could not have relied upon any statements by this lessor. Related to this is another provision in the warranty disclaimer which provides that, "Lessee understands and agrees that neither the suppliers nor any sales person or other agent of any suppliers is an agent of Lessor." This too is true, notwithstanding the foregoing stipulation in the lease.

The "hell or high water" clause in paragraph 2 requires the lessee to make an "absolute and unconditional" payment to the lessor, no matter what. This provision is predicated on the fact that, as occurred here. Leasetec's only role in this transaction was to provide lease financing to the Lessee Defendants without responsibility for any aspect of the computer system, made clear by the warranty disclaimers discussed above.

Fla. Stat. § 680.407 codifies the enforceability of "hell or high water" clauses. It provides in part:

> (1) In the case of a finance lease that is not a consumer lease, the Lessee's promises under the lease contract become ***irrevocable and independent upon the Lessee's acceptance of the goods.***

Further, the statute provides at Subsection (2)

> "a promise that has become irrevocable and independent under Subsection (1)(a) is effective and enforceable between the parties...(b) is not subject to cancellation, termination, modification, repudiation, excuse or a substitution without the consent of the party to whom the promise runs."

The Court notes that these clauses appear to be uniformly enforced.[2] The Court's attention is drawn particularly to *Colonial Pacific Leasing Corp. v. McNatt, et al.,* 268 Ga. 265, 486 S.E.2d 804 (1997). In this case, ruled upon by the Georgia Supreme Court, a lessee claimed fraud allegedly perpetrated by agents of the supplier of the equipment, similar to as occurred in the case at bar. The lessee signed a Delivery and Acceptance Certificate, and the subject lease contained both warranty disclaimers and a "hell or high water" clause, which that defendant sought to abrogate based upon the fraudulent misrepresentations of the vendor's agents. After providing a detailed discussion of equipment lease financing, the respective roles of a finance lessor, the equipment

**2.** *State of West Virginia, Department of Finance and Administration v. Hassett (In re O.P.M. Leasing Services, Inc.)* 21 B.R. 993 (Bankr.S.D.N.Y.1982); *Colorado Interstate Corporation v. CIT Group/Equipment Financing, Inc.,* 993 F.2d 743 (10th Cir.1993) (and cases cited); *Benedictine College, Inc. v. Century Office Products, Inc.,* 853 F.Supp. 1315 (D.Kan.1994); *Siemens Credit Corporation v. Kakos,* No. 94 C 5365, 1995 WL 29618. (N.D.Ill., Jan.24, 1995); *Citicorp of North America, Inc. v. Lifestyle Communications Corporation,* 836 F.Supp. 644 (S.D.Iowa 1993) (and cases cited); *National Westminster* *Bancorp N.J. v. ICS Cybernetics, Inc. (In re ICS Cybernetics, Inc.),* 123 B.R. 467 (Bankr. N.D.N.Y.1989) *aff'd,* 123 B.R. 480 (N.D.N.Y. 1990); *IBM Credit Corporation v. Assist Network Development, Inc.,* 1992 WL 330380 (N.D.Ill.1992); *Emlee Equipment Leasing Corporation v. Waterbury Transmission, Inc.,* 31 Conn.App. 455, 626 A.2d 307 (1993) (and cases cited); *Chemical Bank v. Rinden Professional Association,* 126 N.H. 688,126 N.H. 688, 498 A.2d 706 (1985); *Theodore & Theodore Associates, Inc. v. A.I. Credit Corp.,* 172 A.D.2d 824, 569 N.Y.S.2d 194 (2d Dept.1991).

supplier and the lessee, the Court enforced the warranty disclaimers. Relying even upon a law journal scholarly analysis of U.C.C. Article 2A, the Court also enforced the "hell or high water" clauses determining that "in order for the purported fraud of the employees of the equipment supplier to authorize recision of the finance lease, their actions must somehow be imputed (to the assignee lessors) through the finance lessor."[3]

■ We note that the factors the Court considered in *Colonial Pacific* are present in the case at bar, including: (1) None of Orient's employees were trained or authorized by Leasetec to negotiate the lease for Leasetec; (2) Orient merely submitted the credit application to Leasetec for review and decision, which the *Colonial Pacific* Court found as a matter of law to not make the supplier an agent of the Lessor; (3) Orient's employees were the persons who made the fraudulent statements to the Lessees; and (4) The Orient employees never represented themselves as being agents of Leasetec. Based upon these factors, the Court concluded that the "hell or high water" clauses contained in the lease were viable. *Id.* 486 S.E.2d at 809. Moreover, the Court also rejected the defense of failure of consideration due to the waiver of the express and implied warranties. *Id.* at 809.[4] This Court also finds the hell or high water clauses in these leases enforceable.

Defendant Leibstone has pled and argued the affirmative defense of unconscionability. The factual basis for the defendant's claim is that: (a) Leasetec had some duty to confirm the subject lease transactions in greater detail, (b) that it was unfair for Leasetec to wait to fund Orient until after the respective lease documents, including the Delivery and Acceptance

Certificate, were signed, and (c) that the lease gross amount is unfair since the actual value of the equipment was minimal. The Court rejects these positions.

■ First, as to Leasetec's responsibilities to inspect the equipment, both the equipment lease in issue and Article 2A as described above, do not impose such a burden on the equipment lessor. This Court notes that the Supreme Court of Georgia in *Colonial Pacific Leasing Corp. v. McNatt, et al.,* 268 Ga. 265, 486 S.E.2d 804 (Ga.1997), held, that:

"a finance lessor often has neither the opportunity nor the expertise to inspect the goods in order to discover defects in them. Given the limited function of the lessor, the lessee relies almost entirely on the supplier for representations, covenants and warranties."

Here, the critical fact is that Leasetec relied on the representation of the Lessee Defendants who signed the D & A's stating they had received the equipment. There is no reason Leasetec would question the signatures and as a matter of law, they were entitled to rely upon them without further investigation.

■ As to the defendants' position that Leasetec acted unconscionably in requiring signed documents before funding, the Court can only say it is unaware of any type of business transaction (particularly in the area of finance) where the money is let out the door before the parties obligations are reduced to writing. This is not unconscionable, it is good and logical business practice. In this case it is particularly obvious that requiring a lessee's signatures on documents before writing checks to vendors is necessary, since all parties concede Leasetec had no role in the trans-

**3.** In the case at bar, Leasetec had not sold and assigned the lease.

**4.** This Court notes that the affirmative defense of lack of consideration was pled by defendant Leibstone. Defendants Montenapoleone and Zakka pled no affirmative defenses, which are specifically required to be pled in

the answer by Rule 8(c) or they are deemed waived. See *McKinnon v. Kwong Wah Restaurant,* 83 F.3d 498, 505 (1st Cir.1996). (To avoid a waiver, defendants must assert all of their affirmative defenses in the answer); See also *Williams v. Ashland Engineering Co.,* 45 F.3d 588, 593 (1st Cir.), cert. denied, 516 U.S. 807, 116 S.Ct. 51, 133 L.Ed.2d 16 (1995).

action except for providing funding. Of course Leasetec would want to see documents where people assume legal obligations before they make payment.

■ Defendants' third position is that since only approximately $5,000 worth of equipment was to have been financed, even though the Lease Schedules and supplier invoices reflect the amounts of computer equipment to have been dramatically more, such as in Leibstone's case, $78,000, and in Montenapoleone's case, $57,000, that paying the full freight of the lease is unfair. There is no question but that the representations of the value of this equipment, however, came directly from the Defendant Lessee and the vendor, Orient. This cannot be unconscionable because these very defendants are the ones who misrepresented the value of the subject computers by signing the Lease Schedules that itemized the artificial values. Moreover, the parties made clear Leasetec had no role in selecting equipment or negotiating price and as discussed above, the parties expressly disclaimed that Leasetec had such responsibility for pricing. Therefore, no such burden shall fall on Leasetec and the payment terms are reasonable.

Courts consider the legal theory of unconscionability based upon either a procedural or a substantive analysis of the transaction. Under "procedural unconscionability", the Court focuses on those factors surrounding the entering of the contract, which add up to an absence of meaningful choice on part of one of the parties to the contract. "Substantive unconscionability" focuses directly on the terms of the contract itself to determine whether there was an outrageous degree of unfairness to the contracting parties. *Steinhardt v. Rudolph,* 422 So.2d 884 (Fla. 3d DCA 1982), *Meeting Makers, Inc. v. American Airlines, Inc.,* 513 So.2d 700 (Fla. 3d DCA 1987).

■ Procedural unconscionability fails in this case. The Lessee Defendants admitted that they neither sought out any other alternative computer equipment supplier, nor any alternative equipment finance company. Given this, and considering that the defendants admitted that they initiated the transactions, if there was an absence of meaningful choice on proceeding forward with the transaction, it was caused directly by the defendants who did nothing to seek out alternatives. This is even more the case since they admit not even having any contact with Leasetec, who therefore could not have been heavy handed in the transaction. In *Steinhardt, Id.* at 889, the Court said that a party will not be relieved of his obligations under a contract because he has made a bad bargain containing contractual terms which are unreasonable or impose an onerous hardship on him. In fact, the Court further held, "it is only where it turns out that one side or the other is to be penalized by the enforcement of the terms of a contract so unconscionable that no decent, fair-minded person would view the ensuing result without being possessed of a profound sense of injustice, that equity will deny the use of its good offices in the enforcement of such unconscionability." *Id.* at 890.

In *Meeting Makers, Inc. v. American Airlines, id.,* warranty disclaimers such as in the case at bar were enforced, and the Court held that the defendant had the burden to prove unconscionability, and failed to substantiate its allegations that the parties were of unequal bargaining power. In *Fotomat Corporation of Florida v. Chanda,* 464 So.2d 626 (Fla. 5th DCA 1985), the Court said that in determining whether a contract is unconscionable, it should be reviewed in light of the circumstances that existed when it was made, rather than viewing unfairness of the agreement in retrospect because of the result. In this instance, both Leibstone Associates and Montenapoleone provided testimony that they wanted to proceed with the transaction. They did not complain about it at the time that it failed; they only complain about it now.

Defendants Montenapoleone and Zakka argued at trial that Scuotto was without authority to sign the personal guaranty on

behalf of Zakka, although he was authorized to sign the corporate documents. The Court notes this would have been an affirmative defense, but that no affirmative defenses were pled by these defendants. See Footnote 4. Additionally, the pretrial statement does not identify this as an issue at Section 6(d) which expressly concerns these defendants, or in the Statement of Disputed Issues of fact. On the contrary, paragraph two of the pretrial stipulation expressly provides:

"Also on March 19, 1998, Giovanni Scuotto ('Scuotto') executed and delivered to Leasetec the Zakka guaranty whereby he unconditionally guaranteed the obligations of Montenapoleone under its lease. In fact, all of the Montenapoleone lease documents were signed by Scuotto, who both wrote and printed Zakka's name as President of Montenapoleone for the corporate signatures, and Zakka, individually for the guaranty."

■ The Court cannot ignore the defendants' pleadings which fail to raise a lack of Scuotto's authority as an issue. Nevertheless, because the matter was tried, the Court will briefly deal with the issue in rejecting it. In *Fidelity & Casualty Co. of New York v. D.N. Morrison Construction Co., Inc. of Virginia,* 116 Fla. 66, 156 So. 385 (1934), the Florida Supreme Court said that "apparent authority is equal to real authority, in the absence of proper steps taken to put the world on notice." *Id.* at 387. There is no question based on the admissions of Zakka, that Scuotto had full authority to handle this transaction on his and the company's behalf, and that no limitation on his authority was expressed in any writing, much less ever disclosed at any time to Leasetec. The issue of Zakka not signing the guaranty was not even raised until well into this litigation. Given that, Scuotto had apparent and actual authority to bind Zakka on the guaranty. See also *Barnes v. Paducah Box & Basket, Co.,* 147 Fla. 362, 2 So.2d 861 (1941), (Guaranty enforced on the basis of apparent authority by an agent where no limitation of the authority of the agent given).

The Court also notes with particular interest, *Affiliated Corporate Services v. Englewood Community Health Organization, Inc.,* 1999 WL 652027 (N.D.Ill., August 20, 1999). In this action which concerned two of the same issues before this Court, the defendants' arguments were both rejected. In *Affiliated,* a lessee also claimed vendor fraud and raised a defense of lack of consideration, much as Leibstone Associates has done. In *Affiliated* and the case at bar, the defendants argued that they were not liable for the lease because they did not receive consideration, either in the form of the equipment or any proceeds. That Court found that the lessor suffered a detriment in the amount of the lease proceeds that it paid to the vendor, and agreed that such detriment creates consideration.

The second issue pertained to the lessee defendant claiming the signature on the lease was a forgery perpetrated by an agent of the defendant. In rejecting same, that Court noted,

"If the agent, acting with apparent authority, commits a fraud against a third party who reasonably believed that he was entering into a bonafide transaction with the agent's principal, the principal is charged with the fraud." Citing *Hartmann v. Prudential Insurance Co. of America,* 9 F.3d 1207, 1211 (7th Cir. 1993), citing *Gleason v. Seaboard Air Line Ry. Co.,* 278 U.S. 349, 49 S.Ct. 161, 73 L.Ed. 415 (1929).

The Northern District of Illinois concluded, as does this Court, that if the agent, Scuotto, had actual or apparent authority to sign the other defendants' name to the lease agreement, as he did, those defendants. Montenapoleone and Zakka are liable.

Final judgment is appropriate as to the contract related counts because the evidentiary record establishes that: (1) all of the leases and guarantees were executed by the Lessee Defendants;[5] (2) the Lessee

---

5. Except for the proviso as to Montenapoleone and Zakka, where Scuotto, the defen-

Defendants failed to make the payments due pursuant to the leases and guarantees, despite demand; (3) there is due, owing and payable to Leasetec under each of the defendants' leases, damages proven up by Elaine Stuart, Leasetec's representative, the sums of (i) $104,010.53 (plus a per diem of $51.94 from and after November 19, 1999) as to Leibstone Associates and Leibstone, jointly and severally, and (ii) $76,544.13 (plus a per diem of $38.22)[6] as to Montenapoleone and Zakka, jointly and severally.

The Court notes that each lease and guaranty also provides that Leasetec is entitled to recover its reasonable attorneys' fees in the enforcement of its rights thereunder. Leasetec retained the law firm of Genovese Lichtman Joblove & Battista, P.A., who represented it throughout this action. The Court will award reasonable attorneys and costs to Leasetec and reserves jurisdiction to do so. Leasetec's attorneys are directed to file and serve appropriate attorneys fee affidavits, setting out each attorneys reasonable wage in an hourly rate and each attorneys' hours billed, included with an itemized sheet with a brief explanation as to the work completed for each item billed, within thirty days (30) of the date of this order. If Plaintiff seeks Costs, the Courts have delineated certain items which are available to be collected as costs.

28 U.S.C. § 1920, taxation of costs, provides as follows:

A judge or clerk of any court of the United States may tax as costs the following:

(1) Fees of the clerk and marshal;

(2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;

(3) Fees and disbursements for printing and witnesses;

(4) Fees for exemplification and copies of papers necessarily obtained for use in the case;

(5) Docket fees under section 1923 of this title;

(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

A bill of costs shall be filed in the case and, upon allowance, included in the judgment or decree.

### (ii) *Fraud.*

Because the execution of the leases is not in question and the plain language of the lease documentation contains representations and warranties blatantly abrogated by each of the defendant lessees which induced each transaction, Leasetec is entitled to judgment against all defendants on the fraud counts.

 The elements of a fraud claim include: (i) a false statement of a material fact, (ii) a showing that the representor knew or should have known the representation was false, (iii) the intent that the representation induce another to act on it, and (iv) injury to the party acting in justifiable reliance on the representation. *Babbit Electronics, Inc. v. Dynascan Corporation,* 38 F.3d 1161 (11th Cir.1994). *Mobil Oil Corp. v. Dade County Esoil, Management Co., Inc.,* 982 F.Supp. 873 (S.D.Fla.1997). Each of the elements of this claim are present here.

**Misrepresentation**—Leibstone Associates andMontenapoleone falsely represented to Leasetec in their respective Leases and System Schedules that they were acquiring computer systems at stated prices dramatically higher than the fair market value of the equipment they were supposed to lease—leading to Leasetec, who was to remain the owner of the equipment,

---

dants' expressly authorized agent signed the documents for the defendants.

**6.** There was no testimony about this per diem, but the Court has calculated it based upon the ratio between $104,010.53 and $76,544.13.

paying ten to fifteen times more for the equipment than the actual acquisition cost represented. And as to Leibstone Associates and Leibstone, they also failed to disclose that a major amount of the money coming out of the transaction, $60,000, which was the difference of the actual cost of the equipment and the false amount which they were getting Leasetec to pay Orient for, was being disbursed by Orient to it.

Further, to close each deal, Leibstone Associates and Montenapoleone certified in their Delivery and Acceptance Certificates that they actually received the equipment identified in the System Schedules and that it worked. As it turned out, nobody received their equipment, but Leasetec funded each transaction based upon receipt of the documents which represented everything about the transaction was in order. As to Leibstone Associates, Leibstone personally orchestrated this fraudulent scheme and signed false Schedules and D & A's *twice*. As to Montenapoleone, Zakka directed his agent, Scuotto to act, who then fraudulently closed the transaction.

The Court must assume that Leasetec would not have entered into the lease or paid Orient for the equipment had the true nature of the transaction been disclosed to Leasetec. This is important because Leasetec would have necessarily believed it owned collateral (the equipment) which bore a cost relationship to the amount of property it thought it was paying for.

**Guilty Knowledge**—Scienter—None of the Lessee Defendants received the equipment they certified to in the System Schedule and Delivery and Acceptance Certificate, both being short and simple forms. The Court concludes that the parties had to know the documents they signed were false.

The Defendants have attempted to portray themselves as victims. It may be true and perhaps to some degree unfortunate that Orient lied to the defendants, but the Court is mindful: (1) that the defendants not Leasetec, initiated both the contact with Orient and then the actual resulting transaction, (2) that the defendants were guilty of the single most significant act which signaled and caused Leasetec to fund Orient, which was their false signing of the Delivery and Acceptance certificates—in Leibstone's case, the Court notes he signed false Schedules and D & A Certificates not once, but twice, (3) that they went into the transaction without the slightest bit of due diligence as to Orient, both from an investigatory standpoint and by not seeking other potential computer suppliers or finance companies, and (4) even after the fact of the occurrence of the fraud, and when Leibstone and Zakka knew they too had been taken by Orient, they thereafter took no action whatsoever to even put Leasetec on notice that they believed there was a problem with Orient, something the Court believes is inconsistent with being a victim and should have occurred if in fact the defendants were truly try to deal in good faith.

That both Leibstone and Zakka claim to have not read the documents is also of no consequence. If the Court were to blindly accept that a defendants not reading documents he signed served as a bona-fide legal defense to non-liability for their breaches of contract or misrepresentations, this could become the single defense every defendant would interpose in any legal proceeding, particularly in fraud cases. The individual defendants are sophisticated businessmen and the law infers that they read the documents, knew the contents and are responsible for performance of the contract or the torts that arise therefrom. See *Onderko v. Advanced Auto Insurance, Inc.*, 477 So.2d 1026 (Fla. 2d DCA 1985). (Equipment lease enforced against party who signed, but didn't read it). See also, *RLI Insurance Co. v. Collado,* 678 So.2d 1313 (Fla. 2nd DCA 1996).

Notwithstanding, even while the Court can accept the possibility that the Defendants did not read the small but legible print of the Lease, the Court does not find

it credible that they did not read their Delivery and Acceptance Certificates, given their big type, the simple layout of the document, and considering that its sole provision is located right above their signature and contains only 42 plain English words. We also note that similarly, the "Original Purchase Price/Total Cost" of the computer system is located on each System Schedule just above the signature lines. All of this leads the Court to find the defendants' scienter.

**Intent**—It is uncontested that each Lessee Defendant wanted their deals to close. By signing the documents they facilitated the fraud, inducing Leasetec to pay out substantial money on a transaction that did not exist. To make it worse, because this was a lease transaction and Leasetec was to remain the owner of the equipment, once it was discovered the computer equipment didn't even really exist, Leasetec was left without even its personal property to liquidate in order to mitigate its loss.

**Damages**—Leasetec proved up its damage through the testimony of Elaine Stuart, discussed above.

Every defendant in this action is without defense. For whatever reason motivated them, every defendant entered into fraudulent lease transactions with the specific knowledge that the transaction was not as it was purported to be. The most central fact of their liability is the very simple fact that they signed the interrelated series of lease documents which contained lies. In reliance on the critical lease representations and warranties, and more particularly, the signed Lease Schedules and Delivery and Acceptance Certificates which described the nonexistent equipment which each Lessee Defendant certified they received, Leasetec provided the funding necessary to close the transaction. The fact that Orient failed to pay the agreed upon kickback to Leibstone or otherwise failed to deliver the equipment is of no consequence. The defendants knew the ramifications of their actions. Their hands are unclean.

■ Because Leasetec has sustained a pecuniary loss as a result of the intentional fraud described in the fraud Counts, Leasetec is usually entitled to recover punitive damages from Leibstone Associates, Leibstone, Montenapoleone and Zakka. "An award of punitive damages is proper when a defendant's conduct 'is characterized by 'willfulness, wantonness, maliciousness, gross negligence or recklessness, oppression, outrageous conduct deliberate violence, moral turpitude, insult or fraud.' " *Palm Beach Atlantic College, Inc. v. First United Fund, Ltd.,* 928 F.2d 1538, 1546 (11th Cir.1991); *Cook v. Deltona Corp.,* 753 F.2d 1552, 1563 (11th Cir.1985). The fraud in this case does not raise to a level that merits punitive damages. "A plaintiff is not entitled to punitive damages as a matter of right. No matter how egregious the defendant's conduct, whether to award punitives is left to the factfinder." *Ivory Wright, et al. v. Joseph Sheppard,* 919 F.2d 665, 671 (11th Cir.1990). The Judge, in this case which proceeded as a bench trial, is the finder of fact. The Court, in evaluating the evidence, concludes that neither Defendants' actions rise to the level of willfulness or gross disregard for Plaintiff's rights to assess punitive damages. *Id.* at 671.

Accordingly, after due consideration, it is

**ORDERED AND ADJUDGED** as follows:

1. Judgment is entered in favor of Plaintiff Leasetec Corporation and against defendants William Leibstone Associates, Inc. and William Leibstone, jointly and severally, on Counts I, III and IV of the Amended Complaint in the amount of $ 104,322.17, plus post-judgment interest as allowable by law.

2. Judgment is entered in favor of Plaintiff Leasetec Corporation and against defendants Montenapoleone and Marcel Zakka, jointly and severally, on Counts XVI, XVIII and XIX of the Amended Complaint in the amount of $ 76,773.45,

plus post-judgment interest as allowable by law.

3. The Court reserves jurisdiction to amend this judgment to award Plaintiff Leasetec attorneys fees and costs as against all four defendants herein and Plaintiff's counsel is directed to comply with the terms of this order as provided above.

4. Let execution issue forthwith.

5. Plaintiff's attorneys shall submit itemized and verified forms in conjunction with any possible requests for Attorneys' Fees.

6. The Clerk shall deny all pending motions as moot.

7. The Clerk shall close this case.